# CASES DETERMINED

IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### AT FEBRUARY TERM, 1873.

THE STATE, THE BOARD OF POLICE COMMISSIONERS OF JERSEY CITY AND WILLIAM DeHART, PRESIDENT OF SAID BOARD, RELATORS, v. EZEKIEL M. PRITCHARD, THOMAS EDMONDSON, THOMAS A. GROSS, AND FREDERICK A. GOETZE, DEFENDANTS.

1. The right to remove a state officer for misbehavior in office does not appertain to the executive office—such act is judicial, and belongs to the court of impeachments.
2. Certain police commissioners of Jersey City, appointed by statute, having been convicted upon indictment of conspiracy to cheat the city, and the governor having declared their offices to be thereby vacated, and having appointed their successors—*Held*, that such executive action was illegal and void.

This was an information in the nature of a *quo warranto.*

The information set forth the following facts, viz.: That Jersey City was duly incorporated by virtue of an act entitled "An act to reorganize the local government of Jersey City," passed March 31st, 1871, and that by a certain section of said act a board of police commissioners, consisting of five members, was constituted, and that said board should be the

101

individuals named in said act, and that their successors should be chosen by the senate and general assembly in joint meeting, and that one of the members should hold his office for one year, two for two years, and two of them for three years; that the senate and general assembly of each succeeding legislature should, in joint meeting, choose as many persons to be members oi said board as should be required to fill vacancies therein, and that if any vacancy should occur by the death, resignation, or disqualification of any incumbent after the final adjournment of the legislature and prior to the assembling of the next legislature, such vacancy should be filled by the governor of the state, by the appointment of a suitable and discreet citizen of Jersey City, who should continue in his said office till his successor should be chosen, which said successor should be chosen by the senate and general assembly next succeeding the occurrence of the vacancy.

That by another section of said act it was provided that said board of police commissioners should consist of the five following persons, viz.: Thomas Edmondson, Frederick A. Goetze, Thomas A. Gross, Isaiah S. Hutton, and Ezekiel M. Pritchard. That said police commissioners having been duly qualified went into said office; and that the said Isaiah S. Hutton's term having expired, one Jacob Y. Marinus was appointed by the senate and general assembly to succeed him.

That afterwards, on the 22d day of June, 1872, by the consideration and judgment of the Court of Oyer and Terminer and General Jail Delivery of the county of Hudson, the said Edmondson, Pritchard and Gross were convicted of the crime (in the words of the information,) of conspiracy to cheat and defraud, and of cheating and defrauding the mayor and aldermen of Jersey City of the moneys of the said mayor and aldermen, which crime they had committed during the term for which they were severally appointed to said office, and while they held the same as aforesaid, and were sentenced to pay each a fine of one hundred dollars, &c.; and that the said crime of which they, the said Thomas Edmondson,

Ezekiel M. Pritchard and Thomas A. Gross, were so con-
victed as aforesaid, was an infamous crime, and contrary to
the duty of the said office of police commissioners, whereby
the said offices so before that time and then held by them,
the said, &c., became forfeited and vacant by reason of the
disqualification of the said, &c., being severally so disquali-
fied to hold said office ; afterwards, to wit, on the 30th day
of July, in the year of our Lord 1872, his excellency, Joel
Parker, governor of the State of New Jersey, duly and legally
appointed and commissioned the said William DeHart a
police commissioner of Jersey City in the place of the said
Thomas Edmondson, the said James Flemming in the place
of the said Ezekiel M. Pritchard, and the said Matthew
Monks in the place of the said Thomas A. Gross ; and that
afterwards, on the 13th day of August, in the year last
aforesaid, the said Joel Parker, governor as aforesaid, issued
to the said Thomas Edmonson, Ezekiel M. Pritchard and
Thomas A. Gross, each a writ or notice of discharge, under
the great seal of the State of New Jersey, discharging each
of them from his said office of police commissioner of Jersey
City, and requiring them each to deliver to the said William
DeHart, James Flemming and Matthew Monks, everything
pertaining to the said office of police commissioner of Jersey
City which remained in their possession or under their control,
with the appurtenances to the said office belonging, &c."
There was a further averment, that the new appointees were
duly qualified and took upon themselves the said office ; and
it was then stated that the old incumbents refused to surrender
their positions, which was followed with the usual allegation
that without right they were still usurping the privileges,
liberties and franchises to the said office belonging, &c.

In the body of this information, a transcript of the indict-
ment and conviction of the defendants for the conspiracy re-
ferred to was set out.

The plea of the defendants consisted in a statement of their
title to the office by their appointment in the manner set out

in the information, concluding with the formal averment that they had not usurped the said office, &c.

There was also a second plea, which it is not necessary to notice.

To these pleas there was a general demurrer.

Argued at November Term, 1872, before BEASLEY, Chief Justice, and Justices BEDLE, DALRIMPLE and SCUDDER.

For the relators, *L. Abbett* and *S. B. Ransom.*

For the defendants, *J. Dixon, Jr.,* and *C. Parker.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   The question to be resolved in this case, is an important one, touching as it does, the authority of the chief executive officer of the state, and involving, in a material particular, the tenure of public offices. Such a subject very manifestly required, and has received, a careful and deliberate consideration, on the part of the court.

The facts of the case, which give rise to the proposition to be discussed, stripped of all unnecessary particularities, are simply these.   Certain members of the board of police commissioners of Jersey City were convicted in a criminal court of a conspiracy to defraud the city, by means of their office; and, the attorney-general advising the course, his excellency the governor, declared and adjudged the offices of such convicts to be vacant, and, accordingly, appointed their successors. The inquiry is, whether, by the conviction of these criminals, or by the adjudication of the governor, these offices became vacant, for if this was so, the appointment of substitutes was admittedly proper under the statute.

There are two points for inquiry then : first, does a public office, by the mere fact of the malfeasance of the incumbent with respect to it, and anterior to any judicial judgment upon the subject, become forfeited ; and second, if such forfeiture

State, ex rel. Police Com'rs of Jersey City, v. Pritchard et al.

does not thus occur, can the governor of the state adjudge the question and declare a vacancy ?

At the hearing in this court, the counsel for the relators strongly pressed the conclusion that, inasmuch as a conviction of the crime of conspiracy, by force of the act concerning witnesses, incapacitates the convict from being a witness in a judicial proceeding, and in consequence thereof, the constitution prohibits such convict from enjoying the right of suffrage, that, as a necessary result, there was a deprivation also of the prerogative to hold office. But this, I think, is a manifest *non sequitur*. Because, as a punishment, the law has denounced the loss of two of the rights of citzenship, it does not follow that a third right is to be withheld from the delinquent. Indeed the reverse result is the reasonable deduction, because, it is clear on common principles, that no penalty for crime but that which is expressly prescribed can be exacted. The fact that severely penal consequences are annexed by statute to the commission of a breach of law, cannot warrant the aggravation, by the judicial hand, of the punishment prescribed. In this case it is impossible for this court to say to these officials, that in consequence of their crime, the statute declares that they cannot be witnesses, and that the constitution deprives them, on the same ground, of the right to vote, and that, therefore, the law inflicts upon them a forfeiture of office. It may well be, that the provision would be both just and expedient, which should declare that the conviction of any official delinquency, should, *ipso facto*, work a forfeiture of the office which had been so abused. It is possible that the legislature, upon attention being called to the subject, might pass an act with such an aspect, but all that the court can say is, that no such law is now in existence. The punishment of the crime of conspiracy is definitely fixed by the constitution and by the statute : no addition can be made to this measure except with the legislative sanction. The severity of the present punishment, may indeed denote that the crime is of a high grade ; but that fact leaves the question at issue still to be solved, whether a conviction of any crime

operates, in the absence of any adjudication to that effect, and without express statutory provision, so as to forfeit an office as a legal result. I do not think the present application can stand on this first ground.

In the second place the counsel of the relators, in support of their side of the case, appealed to the rules of the common law, insisting that, according to the usages of that system, the king could seize upon a public office, on the ground that it had been forfeited by misconduct. But I have not found that the cases, with which the court was favored, sustain the royal prerogative to so wide an extent as is claimed in this proposition. Indeed, among all the cases that I have examined, I find no exemplification of the exercise of such an act of authority. On the contrary, it seems to me quite clear that the removal of an officer, holding for a definite term, by the sovereign, *mero motu*, on the plea of misbehavior, would have been a plain usurpation. I can find nowhere any traces of such a right having been claimed. And when we consider that some of the offices under that government were held for life, and others in fee, and that most of them have ever been regarded as property of great value, it would certainly be matter of surprise if we found, in a system in which all valuable interests are so jealously guarded, that franchises of such moment should be liable to divestment on the arbitrary judgment of the monarch. If such a despotic power had existed, it would have left very abundant indications of its abuse during those reigns which are memorable for little else than the oppression of the subject and the rapacity of the ruler. But neither in the history of the nation, nor in the judicial decisions, do we perceive any marks of the possession, by the sovereign, of such a prerogative. But, to the reverse, it will be found that, in this respect, as in all others, the rights of the office holder were carefully protected, and that he could not be deprived of them except by due process of law. The method of proceeding against a delinquent official, was thus:

When a question arose whether an office was forfeited, so

State, ex rel. Police Com'rs of Jersey City, v. Pritchard et al.

that the king was entitled to the possession of it, an inquest of office was instituted, which, we are told, was an inquiry made by the king's officer, his sheriff, coroner or escheator, *virtute officii*, or by writ to them sent for that purpose, or by commissioners specially appointed. " These inquests of office," says Blackstone, 3 *Com.*, *ch*. 17, " were devised by law, as an authentic means to give the king his right by solemn matter of record, without which he in general can neither take, nor part from any thing. For it is a part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon and seize any man's possession, upon bare surmises, without the intervention of a jury." If such inquisition resulted favorably to the pretensions of the king, he could at once enter into the possession of the office. But such action was far from concluding the rights of the office holder. He held his franchise by letters patent, and these could not be annulled except by judicial decision. The authority just vouched, tells us " that where the patentee hath done any act that amounts to a forfeiture of the grant, the remedy to repeal the patent is by *scire facias* out of chancery." This latter process could be brought by the king, in order to resume the thing granted, or if the rights of a subject were involved, the king was bound, upon petition, to allow the use of this remedy. And we have high authority for the proposition that where a common person is obliged to bring his action ; there upon an inquisition or office found, the king is put to his *scire facias*. 9 *Rep.* 96.

And it is important that the nature of this proceeding by *scire facias* should be noted. This process was an original writ issuing out of chancery, and could be made returnable into the king's bench. It was required to be founded on some matter of record. In point of form the *scire facias* recited the patent, and set forth the grounds of forfeiture. On the return of the writ the defendant could appear, and, if the matter alleged was not sufficient for the repeal of the patent, he could demur, or he could deny the facts stated, in

which latter event the issue was sent, as in common cases, to be tried by a jury.

Nor was the office holder remediless in case the king, upon office found, went into possession of the franchise and refrained from issuing a *scire facias* to repeal the patent. "In order to avoid the possession of the crown acquired by the finding of such office," the language is again that of Sir William Blackstone, "the subject may not only have his *petition of right*, which discloses new facts not found by the office, and his *monstrans de droit*, which relies on the facts as found, but also he may (for the most part) *traverse* or deny the matter of fact itself, and put it in a course of trial by the common law process of a court of chancery; yet still, in some special cases, he hath no remedy left but a mere petition of right. These *traverses*, as well as the *monstrans de droit*, were greatly enlarged and regulated for the benefit of the subject by the statutes before mentioned, and others."

That by force of the English law, the king could not take into his hands on his own judgment an office on the ground in question, is abundantly shown in all the line of adjudication relating to the subject. There is a long array of such cases, systematically arranged by Lord Coke, in Sir George Reynel's case. 9 *Rep.* 95.

Nor does the case of Sir John Savage, which was much pressed upon the argument by the counsel of the relators, gainsay the principle above enunciated. For this decision (2 *Dyer*, p. 151,) was referred to; but this account is too meagre to be perspicuous, and the point and grounds of judgment can be made intelligible only by reference to the narration in *Keilway*, p. 194. This report is in Norman French, and any gentleman who has (perhaps) improved a part of his leisure in acquiring an insight into that unclassic jargon, will find that the subject of inquiry was this: The defendant was sheriff of Worcester, and an information was exhibited in the King's Bench showing his title, and reciting that the commissioners of Oyer and Terminer had found that he held such office by letters patent in fee; that certain persons

charged with felony had been committed to his custody whom he had " willfully and feloniously " suffered to escape. The information then stated that for this cause the king had taken possession of the office. After these averments, then followed a statement that upon these facts a *scire facias* had been awarded, setting forth these matters, and directing the defendant to appear and show cause wherefore our letters patent aforesaid, &c., should not be annulled, revoked and cancelled. To this information the defendant appeared and pleaded, and two of the questions mooted and decided were, whether the commissioners of Oyer and Terminer could hold an inquest of office, and whether the finding of two indictments for misconduct in office was equivalent to the finding of a forfeiture, and the court held in the affirmative on both points. Lord Coke, in Sir George Reynel's case just cited, refers to this decision as establishing the rule that " two matters of record shall amount to an office." This authority, therefore, which seems to be somewhat anomalous, falls short of giving support to the proposition that an indictment and conviction would have justified the seizure of an office on the part of the English sovereign. " An information, or an indictment for an offence which is a cause of forfeiture, and a conviction on it," is given by Baron Comyns, as a foundation for a *scire facias* to repeal letters patent, but no authority has been adduced, nor, as is believed, can be found, to the effect that such proceedings will in themselves justify the resumption of the official franchise without suit by the monarch.

The result to which, therefore, I am led is, that even on the assumption that the modes of proceeding with respect to forfeited offices, are identical in this state with those which were established in use under the English government, nevertheless, the defendants in this case, under the circumstances stated in the pleadings, could not lawfully be put aside from their official positions on the ground which thus far has been the subject of discussion. It has appeared that an indictment and conviction are not equivalent to an inquest of office,

and that consequently the king in such a condition of things, could not have entered and ousted the office holder from the possession. If this is so, it concededly must follow that such power does not reside in the executive of this state.

But my consideration of the questions involved in this inquiry has also entirely satisfied me, that there is not the least propriety in the assumption that the authority of our executive over public offices, is at all comparable with that of the English king. And I have stated the common law mode of proceeding with regard to official misbehavior, not because I think such mode applicable to our political system, but for the purpose, to some extent, at least, of showing its discordance with such system. The very ground-work of the common law practice is wanting with us. At common law, the theory was that the king was the head and fountain of all office. An office was considered a royal franchise in the hands of a subject. In legal contemplation, the incumbent held directly from and under the crown, one of the implied conditions of such holding being that the duties of the office should be properly discharged. It was, hence, the natural product of this theory that if such condition was broken, he who had granted could retake the gift into possession. It stood upon the footing of other species of property growing out of conditional grants. Out of jealousy of the royal power, the free genius of the common law declared a disability in the king to enter upon the office without a finding of this condition having been broken by an inquest of office. But still the principle was recognized, although put under a check, that the power of appointment involved, as an apt incident or convenient supplement, the right to supervise and remove. In addition to this, the king had originally sat as the supreme judge, in the *aula regia*, and hypothetically at least, continued to be the chief administrator of the laws, and dispenser of justice. It consistently resulted that a ruler, clothed with such powers as these, should, subject to the limitations already defined, be also invested with the superintendency over public offices. Every officer was the

deputy of the sovereign ; the condition of the tenure was good behavior, and on the breach of such condition, the king, as the general patron of official franchise, and the representative of the public interests, was empowered, in the mode prescribed by the law, to have a forfeiture of the office declared.

But none of these royal prerogatives, which so appropriately embrace an absolute control over all public offices, are to be found among the powers which go to make up the authority of the executive of this state. Neither theoretically nor in practice is the executive the fountain of office. Nor are public offices franchises of the executive, nor does he distribute them among his deputies. According to the polity of this commonwealth, all public office proceeds, in theory and in fact, from the people. With respect to some of the more important offices, the governor cannot fill them by appointment ; his function is that of nomination, and with respect to others of them, he has no concern ; they are under legislative control solely. In the present instance the incumbents who are sought to be amoved, were appointed by a special act of legislation ; they hold their positions from the people. How then can it be said that they are accountable to the governor with regard to their official conduct ? By the statute in question, the executive is not given any supervision over these officials ; all the authority that it confers upon him, is to fill the office in case of a vacancy. It imparts to him no faculty to declare judicially that such vacancy has occurred, and if such faculty exists, it must be as an inherent constituent of the executive office. I have not been able to perceive any intimation, not even the least, either in the constitution of this state, its system of laws, or legal observances, that this right of superintendency over, or power of removal from public office, except in instances of statutory specification, has been delegated to the executive head of the government. That such authority has not been expressly conferred is unquestionable ; and if such is to be conceded, it must be from the analogy which the executive office bears to that of the English monarch. I have stated the reasons for my con

viction that such similitude is absent. If such analogy existed, the authority to remove would have to be exercised according to the English mode, and it has already been shown that such mode in the present case has not been pursued. No inquest of office has been held, and without such procedure no English sovereign could have removed an offending incumbent. But suppose the proceedings in the present instance had been squared to this common law pattern. In such event a county sheriff, *virtute officii*, or commissioners under a special authority from the governor, would have convoked a jury to make inquisition. Before such jury the party charged with malfeasance could not have been heard; and upon the *ex parte* finding of such tribunal, the governor would, as it is claimed, have been empowered to oust the incumbent and seize the office, and the sole remedy of such evicted incumbent would have been by petition to the executive. It does not seem to me that any one will deny that such a procedure would be in strange antagonism with all the other parts of our frame of laws. Its existence could not be palliated by any of those theoretical reasons which apply to the possession of this power by the English monarch. Unlike the precedent of the common law, the executive would proceed to remove an office holder whose tenure, like his own, was derived from the will of the people. Such a course is inconsistent with the fundamental idea upon which is founded the whole structure of our political institutions, which is that the power of each organ of the government is definite, and that the residuum of power remains in the hands of the mass of the community. Such a theory entirely repels the doctrine that the chief executive has any power to remove a subordinate whose title stands on the same level as his own, unless such power of removal is expressly or by necessary implication, conferred by the law of our political system. It is believed that these inquisitions to inquire as to forfeitures are utterly unknown to the laws and usages of this country. Such a process has never certainly been heard of in this state, nor has any precedent for the use of such

remedy been traced in the legal forms of any state in this Union. Such procedure has never been sustained by any American court, and the subject does not appear to have been ever discussed in any of our own courts, from the reason that until the present occasion, the attempt to evict from office by a supposed analogy to this mode of proceeding, has never been made. The use of such a procedure is condemned *gravissimo judicio taciturnitatis.* But again, the function to declare an office forfeited from malfeasance, is obviously judicial in its character, and this leads to the second inquiry, whether such a function belongs to the governor of this state?

It has already appeared that the authority to adjudge as to the forfeiture of office did not belong to the British crown—the king could not seize the office without inquest of office found in his favor, and could not recall his letters patent except upon a judgment to that effect by one of the regular courts.

The question therefore is, whether the prerogative of the governor of this state, in this respect, overtops that of the British sovereign? If it has this reach, of course the power must be derived from the constitution of the state.

But the framework of the government of this state has been too carefully constructed to leave so important a matter as this in any doubt, or subject to any uncertainty. Its different departments have been nicely adjusted, and the boundaries of their action have been accurately and plainly set and established. And in no part of the instrument is the line of division between the respective branches more clearly marked than between the powers of the executive and those of the judiciary.

By Article III, the constitution declares: "The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

The Vth Article appertains specially to the executive office.

Its provisions are perfectly clear and explicit. It declares that the executive power shall be vested in the governor; that he shall take care that the laws be faithfully executed, and grant, under the great seal of the state, commissions to all such officers as shall require to be commissioned; that he shall be a member of the court of pardons, and may suspend the collection of fines and forfeitures, and that "when a vacancy happens during the recess of the legislature, in any office which is to be filled by the governor and senate, or by the legislature in joint meeting, the governor shall fill such vacancy," &c.

These are all the powers having the least bearing on the subject under consideration, attached by the organic law to the office of the executive.

By Article VI, the whole judicial power is placed in the courts.

It is obvious, therefore, that the governor of this state is not possessed of a particle of judicial capacity. I cannot see that a single one of the powers conferred upon this high office even borders upon such authority. It is true that he is empowered to fill certain vacancies, and in doing such acts he must decide whether or not such vacancies exist. But such decision is in no sense a judicial act. It is a mere assumption of the existence of a certain state of facts on which to base executive action. Such assumptions, or determinations by a chief executive, when they relate to or affect private interests, have no binding force. If the executive should fill an office on the conviction that the incumbent was dead, it is presumed that in the mind of lawyers there would prevail no doubt that if the fact of death had not occurred, the executive action would be void. An estoppel on private right by executive decision is not likely to be pleaded by any well skilled counsel. I think there is no reasonable ground on which to base a claim for the existence of any right of judi-cature in the governor of the state.

And there can be as little doubt that the act of declaring that the offices involved in this case had been forfeited, was a judicial decision. It had all the essential elements of such

an adjudication.  It was a determination of the fact as well as the law, and comprised at once the functions of the jury and the judge, and it related to a right of property.  The questions to be settled were, whether the officer had misbehaved; and that was an issue of fact.  And whether such misbehavior amounted to a forfeiture of office; and that was an issue of law.  The point of fact required the introduction of evidence, and for this purpose the governor had before him the record of the conviction of these defendants in a criminal court.  Whether such record would be competent for the purposes for which it was used, is open as a question of pure law to considerable uncertainty, the usual and inveterate rule being, that a criminal record is not admissible in any suit or proceeding relating to property or the civil rights of persons.  But it is enough to denote that here was presented a rule of evidence to be passed upon.  In all its parts the proceeding was one of ordinary judicature.  And then, too, after the ascertainment of the fact, it became necessary to apply the rule of law.  The result was an announcement that the forfeiture had been incurred.  And this clearly was an act of judicial discretion.  Than the judgment of the judge, there is no other legal test of the effect a certain act of misconduct has upon the right to office.  What malfeasances will work a forfeiture is no part of the *lex scripta*.  There is no statute upon the subject.  It is obvious that it may well be that some convictions in a criminal court may not produce such a result.  The point is not met by the suggestion that in this case the crime committed was one *malum in se*, and made highly penal, because if the jurisdiction is vested in the executive on this occasion, it belongs to him in all cases of official misdemeanor.  It is not too much to say, that of all the cases where there is room for the use of a graduated standard for judicial judgment, the class of cases which comprises the one now considered is the most prominent.  What jury or judge has ever attempted to define that category of offences which in law are operative to deprive the wrong doer of a public office?  And yet such was the question upon

which the executive was called upon to pronounce. These acts were judicial in the most rigorous sense of the term.

And there are other noticeable features of the affair. A matter of fact was to be investigated and settled, and yet the testimony of witnesses could not have been compelled, and oaths could not have been administered. The defendants, whose rights were involved, were not summoned, had no hearing, and were condemned in their absence. Citizens were deprived of valuable civil rights, which they had not the least opportunity to vindicate, and when the decree of deprivation had been pronounced, they had not even the right of appeal. The arbitrary character of such a jurisdiction would of itself be sufficient to demonstrate that it does not exist by force of the constitution of this state. The power of adjudging the question of the forfeiture of office is the capacity of a judge, and does not in any degree appertain to the executive authority.

It cannot fail to have been perceived that the question discussed relates merely to the matter of jurisdiction. That an officer who has made use of the opportunity which his position afforded to perpetrate a fraud upon the public should be summarily cashiered, is a proposition entitled to universal assent. But the result to which I have arrived is, that the finding of the fact of misconduct and the graduation of the punishment are judicial, and not, by virtue of our system of laws, executive functions. And I think, upon reflection, there will be few minds that will deny the propriety of the establishment of this power in a judicial depositary. Its effect is to put the rights of the citizen under the safeguard of the ordinary tribunals, and to surround them with the protection of those modes of proceeding, trial and supervision which are the best, and, perhaps, only guarantees against error and injustice. To have left such cognizance to the executive branch of the government would have been to make these valuable interests to be dependent on the conclusions of a single mind, unassisted by the usual methods for the elucidation of truth, the responsibility of decision being

unrelieved by the consciousness that if the conclusion should be incorrect, the error could be corrected by some supervisory tribunal. Every proceeding to remove an officer for official misconduct or neglect is essentially and thoroughly a judicial proceeding, and has consequently, and with the utmost propriety, been confided to that branch of the state government.

Nor in the frame of the state constitution is there wanting an organ appropriate to the exercise of this jurisdiction. I think the authority in question is vested in the court for the trial of impeachments. By section first of Article VI, which affects a distribution of the judicial power, a portion of it is vested in this tribunal. Its constitution is defined by section third, the right to impeach being given to the assembly, and that of trial to the senate.

The jurisdiction of this important court is not, in express terms, defined. But I think it clear that its cognizance is confined to the misconduct of state officials. In England, as is well known, the jurisdiction of parliament, in this respect, is much more extensive. It is said that in that kingdom all the king's subjects are impeachable in parliament. In practice, however, this kind of prosecution has usually been confined to that class of misdeeds which are particularly injurious by the abuse of important offices of public trust. But such an extent of jurisdiction in this court would be incompatible with the most cherished notions usually prevalent in this country, with respect to the safeguards necessary to the protection of persons and property. And that the scope of the jurisdiction of the court of impeachments, in this state, is much more limited than this, and is restricted to persons holding office under the state, is convincingly manifest from that provision of the constitution which declares that the judgment, in such cases, "shall not extend further than to a removal from office, and to a disqualification to hold and enjoy any office of honor, profit, or trust under this state." Thus, by imperative implication, the limits of jurisdiction are restricted to the offences of this particular class of persons.

The only remaining question therefore is, whether the office holders now involved in this controversy belong, in the constitutional sense, to this class of state officers of whose misdeeds this court of impeachments takes cognizance. The pertinent provision of the constitution is in these words, viz. : " The governor, and all other civil officers under this state, shall be liable to impeachment for misdemeanor in office, during their continuance in office, and for two years thereafter." The present officials are state officers, and I have failed to see how they are to be excluded from the general description of the subjects of impeachment just quoted. The generality of the language, so as to comprise the whole class of state officers, appears to have been designed. In other parts, where the intention was to restrict the effect of a clause to constitutional officers, the language employed is aptly limited. If this comprehensive designation of the objects of the cognizance of this court is not to be fully effectuated, but is to be confined to certain classes of officers, where are the limits to be set? If it does not take in all state officers, which are to be embraced and which excluded? The whole matter would be quite arbitrary. If the executive can try and pronounce upon the delinquency of the present officials, the extent of his power would seem entirely indefinite and precarious, and no reason is perceived why it would not cover the whole field of misbehavior by these public agents. By force of such a construction of the authority of the governor, the functions of the court of impeachments would be substantially superseded.

From these considerations I have come to the conclusion that these defendants were impeachable for their alleged official misdeeds, and that it would have been competent for the court of impeachments to remove them from their posts. A vacancy in these offices would have thus been created, and, in my estimation, this cannot be effected by any other power in the state.

The only adjudication which has come under my notice, which has much relevancy to the subject under discussion, is

State, ex rel. Police Com'rs of Jersey City, v. Pritchard et al.

that of the Court of Appeals in Kentucky, in the case of *Page* v. *Hardin*, reported in 8 *B. Monroe* 648. The controversy related to the office of secretary of state. It appeared that the governor had adjudged that the secretary, "by his failure, willful neglect and refusal to reside at the seat of government and perform the duties of secretary," had abandoned his office, and that the same had become vacant, and thereupon had appointed a successor. The decision of the court was that these proceedings were unwarranted ; that the secretary was not removable, either at the pleasure of the governor or on his judgment, for a misbehavior in office, and that in such cases the jurisdiction resided in the court of impeachments. The opinion read in the case exhibits much thought, as well as clearness and force of argument, and in its general tendency and conclusion sustains the views already expressed.

In consequence of my high respect for the opinion of his excellency the governor, and of that of his legal adviser, I approached the result to which I arrived with hesitation, and at first, with a feeling of diffidence as to the correctness of my deductions. The proposition presented for solution was novel, and the executive action was obviously based on motives of justice and consideration of utility. A pressing evil seemed to call for an immediate remedy, and the mistake was that an erroneous one was adopted. It was a mere mistake of form, and the mistake leaned to the side of right. Full reflection, however, has removed all doubt from my mind, and in the discharge of my duty, I am bound to say that the executive act in question was not authorized by the law of this state.

The defendants are entitled to judgment.

CITED in *Attorney-General* v. *Delaware and Bound Brook R. R. Co.,* 9 *Vr.* 282.